# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EDWARD SCOTT, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> UNION RAILROAD COMPANY, LLC., TRANSTAR, LLC, UNITED STATES STEEL CORPORATION and SMART TRANSPORTATION DIVISION, <br><br> Defendants. | CIVIL ACTION NO.: <br><br> ERISA AND NLRA CLASS ACTION <br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff, Edward Scott, individually and on behalf of all similarly situated former employees of Union Railroad Company LLC, alleges the following upon information and belief, except for those allegations pertaining to Plaintiff, which are based on personal knowledge.

## NATURE OF THE ACTION

1. Plaintiff, Edward Scott (hereinafter "Plaintiff"), brings this action individually, and on behalf of all similarly situated former employees of Defendant, Union Railroad Company, LLC ("Union Railroad") who were targeted and improperly terminated due to their pension status.

2. In or about May 2012, Defendants, led by Union Railroad, Union Railroad General Superintendent, Joel Hudson; United States Steel Corporation ("U.S. Steel"), U.S. Steel General Manager, Jonathan Carnes, U.S. Steel Managing Director, Malisa Sommers; and Transtar, LLC ("Transtar"), initiated a pretextual scheme to terminate Union Railroad employees who were part

1

of Defendant, U.S. Steel's coveted employee pension benefit plan ("Carnegie Pension Fund") ("Pension Employees").

3. Among other things, Defendants' scheme included forcing certain Pension Employees to sign "last chance" agreements intended for employees with substance abuse problems, then manipulating Union Railroad's demerits policy to issue a disproportionate number of demerits to Pension Employees so they could be fired for cause.

4. Conversely, employees with less seniority (and therefore less vested pension benefits) alleged to have committed the same or comparable offenses as Plaintiff and other Pension Employees routinely received no demerits, substantially less demerits or were given an opportunity to expunge demerits from their records over time.

5. In many cases, Pension Employees received a disproportionate number of demerits for technical offenses Union Railroad had historically exercised discretion to ignore.

6. At their grievance hearings and/or arbitrations, Plaintiff and other Pension Employees lacked adequate representation and were overwhelmingly denied relief due to a concerted effort by the Defendants to fabricate or exaggerate the bases for their terminations. Instead of fairly representing its union members as required by the collective bargaining agreement and applicable federal law, Defendant, Smart Transportation Division ("SMART TD" or "the Union"), was complicit in the scheme, in part by facilitating the services of a "union" law firm that failed to inform Plaintiff and other Pension Employees of their potential causes of action under ERISA.

7. A significant and disproportionate majority of Pension Employees were terminated shortly before they reached key vesting periods of 5, 10 and 15 years under the Carnegie Pension Fund.

8. As further described below, Plaintiff and approximately 90 similarly situated former Union Railroad employees were victims of a discriminatory pattern and practice designed to weed out Pension Employees in order to preserve the Carnegie Pension Fund.

9. Plaintiff, Edward Scott, brings this action for violations of § 510 of the Employment Retirement Income Security Act, 29 U.S.C. § 1140 ("ERISA") under the civil enforcement provisions of 29 U.S.C. § 1132(a)(1)(b) and § 1132 (a)(3) and seeks class certification pursuant to Fed. R. Civ. P. 23 to pursue classwide ERISA claims against Defendants, Union Railroad, Transtar and U.S. Steel for adverse employment related actions and/or discrimination against Pension Employees with the intention of interfering with the attainment of their benefits under the Carnegie Pension Fund (Count I). Plaintiff also seeks certification under Fed. R. Civ. P. 23 to pursue classwide claims against Defendant, Smart TD for breaches of the duty of fair representation under the National Labor Relations Act, 29 U.S.C. § 158, *et seq*. ("NLRA")(Count II).

10. Through this action, Plaintiff seeks all damages available to him individually as well as all damages available to the potential members of this proposed classwide ERISA and NLRA action.

## JURISIDCTION AND VENUE

11. This Court has subject matter jurisdiction over Plaintiff's ERISA claims pursuant to 29 U.S.C. § 1132(a)(1)(b), 29 U.S.C. § 1132 (a)(3) and 28 U.S.C. § 1331.

12. This Court has subject matter jurisdiction over Plaintiff's NLRA claims pursuant to 28 U.S.C. § 1337(a) and 28 U.S.C. § 1331.

13. Personal jurisdiction exists over Defendants, Union Railroad, Transtar, U.S. Steel, and Smart TD because, *inter alia*, they each maintain a principal place of business and/or conduct substantial business in the Commonwealth of Pennsylvania. The amount in controversy exceeds $75,000.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events and/or omissions giving rise to the Plaintiff's claims emanated from activities within this jurisdiction and Defendants conduct substantial business within this jurisdiction.

## THE PARTIES

15. Plaintiff, Edward Scott, is an adult individual and a resident of the Commonwealth residing in North Huntingdon, PA. On March 12, 2018, Edward Scott was improperly terminated from Union Railroad where he worked for nearly 11 years as a trainman and, most recently, a conductor.

16. Defendant, Union Railroad is a for-profit corporation incorporated under the laws of Delaware with a corporate headquarters in Pittsburgh, Pennsylvania and principal place of business in Duquesne, Pennsylvania. Union Railroad is a rail transportation company that, at all relevant times, employed approximately 500 individuals and was the direct employer of Plaintiff and other Pension Employees.

17. Defendant, Transtar is a for-profit corporation incorporated under the laws of Delaware with a corporate headquarters and principal place of business in Pittsburgh,

4

Pennsylvania. Union Railroad is a wholly owned subsidiary of Transtar, an entity engaged in the business of transporting raw materials and finished products for a variety of industries.

18. Defendant, U.S. Steel is a for-profit corporation incorporated under the laws of Delaware with a corporate headquarters and principal place of business in Pittsburgh, Pennsylvania. Union Railroad and Transtar are wholly owned subsidiaries of and operate in concert with U.S. Steel. U.S. Steel operates the Carnegie Pension Fund through United States Steel and Carnegie Pension Fund, a non-profit entity incorporated under the laws of Pennsylvania.

19. Defendant, Smart TD, is a non-profit corporation incorporated under the laws of Ohio with a corporate headquarters in North Olmsted, Ohio. SMART TD is a division of the Sheet Metal, Air, Rail and Transportation Union, the labor union that represented Plaintiff and other Pension Employees pursuant to a Collective Bargaining Agreement effective November 1, 1943 and last amended November 8, 2017.

## GENERAL FACTUAL ALLEGATIONS

### A. Defendants' Scheme to Preserve the Carnegie Pension Fund

20. Union Railroad's demerits policy was created to provide a uniform structure to address employee rule and policy violations in a consistent and fair manner. According to Union Railroad, the policy serves as a tool to assure rule compliance while offering employees the opportunity to correct poor behavior as well as to facilitate additional training where necessary.

21. The demerits policy is used to manage employee discipline for offenses such as tardiness, safety violations and misuse of carrier property.

22. Under the policy, managers may use informal coaching in lieu of formal discipline (demerits) for minor violations and have significant discretion with respect to the number of demerits assessed if they elect to issue demerits.

23. If a manager elects to issue demerits, the maximum number of demerits that can be assessed for a single violation is 60. Employees who reach 100 demerits are subject to termination.

24. Union Railroad's demerits policy includes a provision for the removal of demerits from an employee's personnel records if the employee does not accrue additional demerits in the 12, 24 and 36 months following his or her last offense.

25. Beginning in or about May 2012, Transtar and Union Railroad, led by Sommers, Carnes, and Hudson, began manipulating the demerits policy to ensure that Plaintiff and other Pension Employees could be fired for cause.

26. As part of the scheme, Union Railroad compelled certain Pension Employees to sign "last chance" agreements the company had historically used to informally manage disciplinary action for employees with substance abuse problems. In addition, Union Railroad took steps to ensure that previously accrued demerits were not removed from an employee's personnel records even after 12, 24, and/or 36 months had passed since their last offense.

27. The "last chance" agreements were not sanctioned by the Collective Bargaining Agreement or the demerits policy. Plaintiff and other Pension Employees had no opportunity to bargain the terms of the "last chance" agreements.

28. The "last chance" agreements were signed by a significant number of Pension Employees as well as Defendants, Union Railroad and Smart TD.

29. The "last chance" agreements stated that the Pension Employees could continue working at Union Railroad but were subject to immediate dismissal and waived all rights of appeal if accused of another offense. Contrary to the Collective Bargaining Agreement, the "last chance" agreements expressly provided that Defendant, Smart TD, relinquished all rights to investigate or otherwise represent Pension Employees for future misconduct accusations.

30. Unlike the demerits policy, the "last chance" agreements contained no provision for the gradual removal of demerits for good behavior. Instead, they placed Pension Employees who devoted years of service to Union Railroad in a tenuous three (3) year probationary period.

31. With various "last chance" agreements in place, Union Railroad targeted Plaintiff and other Pension Employees by applying the demerits policy against them in a manner inconsistent with the company's history and inconsistent with its application of the same policy for employees with less seniority and thus less vested benefits under the Carnegie Pension Fund.

32. Unlike Plaintiff and other Pension Employees, less senior employees alleged to have committed the same or comparable violations routinely received no demerits, substantially less demerits or were given an opportunity to expunge demerits from their records after a certain amount of time lapsed.

33. In many cases, Pension Employees received a disproportionately high number of demerits after they were accused of committing highly technical offenses such as "stealing" 4 minutes of overtime.

34. Plaintiff and other Pension Employees were the last group of employees with ties to the "Old Guard," a term colloquially used to refer to longtime employees who believed that working at Union Railroad would provide a six-figure salary and full retirement benefits, including

7

full pension benefits, and were afforded small perks such as the ability to sleep during "off-peak" work hours.  Instead Plaintiff and other Pension Employees were subjected to a pattern and practice of discrimination on the basis of their pension status then abruptly terminated.

35. Upon information and belief, Plaintiff and other Pension Employees have since been replaced by candidates with less seniority and/or candidates who were ineligible for benefits under the Carnegie Pension Fund pursuant to March 5, 2004 mediation agreement that sought to replace the company's pension plan with company sponsored 401(k) accounts.

### B.      The Carnegie Pension Fund

36. The Carnegie Pension Fund is sponsored by Defendant, U.S. Steel, and affiliated entities and is a single employer defined benefit pension plan created March 1, 1950.

37. Under the Carnegie Pension Fund, employee benefits vest at five years. However, employees also receive significant increases in the payout of future benefits under the Carnegie Pension Fund after 5, 10 and 15 years of service.

38. Upon information and belief, administrators for the Carnegie Pension Fund forecasted funding deficits for the Carnegie Pension Fund as early as 2011.

39. At the end of 2018, the Carnegie Pension Fund had total plan assets totaling $5.411 billion and plan liabilities totaling $5.184 billion.

40. A significant and disproportionate majority of Pension Employees, including Plaintiff, were terminated shortly before they reached key vesting periods under the Carnegie Pension Fund.

### C.   Smart TD, Was Complicit in the Scheme to Terminate Pension Employees

41.   Plaintiff and other Pension Employees were conductors, brakemen and/or switchtenders ("yardmen") exclusively represented by Defendant, Smart TD, pursuant to a Collective Bargaining Agreement effective November 1, 1943.

42.   Under the Collective Bargaining Agreement, Plaintiff and other Pension Employees were entitled to an investigation, including a fair and impartial hearing, before they could be suspended or dismissed from service.

43.   Upon information and belief, Defendant, Smart TD, retained or otherwise provided to Plaintiff and other Pension Employees the services of a law firm ("the Law Firm.")

44.   As part of this agreement Defendant, Smart TD, would bring attorney representatives from the Law Firm to regularly scheduled union meetings and introduce them as the "union attorneys."  As a result, Plaintiff and other Pension Employees would seek counsel from those attorneys on a variety of work-related matters.

45.   When discussing work-related disputes, such as claims of discrimination based on pension status, Plaintiff and other Pension Employees were routinely advised by representatives from the Law Firm that there was nothing they could do for them.  When pressed further, Plaintiff and other Pension Employees were told that they had no recourse but to rely on the union for work-related disputes because "when you're in [the company's] ballpark, you have to work by their rules."

46.   When Plaintiff and other Pension Employees turned back to the union for help, Defendant Smart TD largely accepted the pretextual bases for Plaintiff and other Pension Employees' terminations rather than taking steps to rebut the discriminatory application of the

9

"last chance" agreements and demerits policy. Defendant, Smart TD routinely advised Pension Employees they should admit guilt during their hearings because "it would make things better in the end."

47. Upon information and belief, Defendant, Smart TD, either themselves or through the Law Firm, failed to inform Plaintiff and other Pension Employees of their potential ERISA claims against Defendants, Union Railroad, Transtar and U.S. Steel, and failed to inform Plaintiff and other Pension Employees that certain statute of limitations may apply to their disputes or that filing grievances would not toll application of those statute of limitations to their claims of discrimination. In fact, Plaintiff and other Pension Employees were specifically told they were forbidden from seeking other outside counsel until they had arbitrated their claims and exhausted any applicable appeals.

48. As such, Defendant, Smart TD, either themselves or through the Law Firm, ensured that Defendants' discriminatory application of the "last chance" agreements and demerits policy would not be investigated by any outside and/or independent agency.

**D**.     **Improper Termination of Plaintiff, Edward Scott's Employment**

49. In July 2007, Plaintiff, Edward Scott, was hired by Union Railroad as a trainman.

50. Based on his performance, Plaintiff was promoted to conductor and Remote-Control Locomotive Operator.

51. Over his 10+ year tenure at Union Railroad, Plaintiff met all the necessary performance metrics and maintained a satisfactory disciplinary record.

**The February 26, 2018 Incident**

52. On February 26, 2018, Plaintiff was working his usual assignment as a conductor when a transportation supervisor accused him of violating Safety Rule 5.16 by operating a switch with one hand.

53. Following a March 15, 2018 hearing, Plaintiff was found guilty of the violation and assessed 30 demerits, bringing his demerit total to 63.

54. Following an unsuccessful appeal, Plaintiff requested arbitration citing the lack of any language in Safety Rule 5.16 requiring two-handed operation of a remote-control switch.

**The March 26, 2018 Incident**

55. On March 12, 2018, Plaintiff was operating a light locomotive train as he approached several rail cars he intended to "couple" or attach to the train. Safety protocols required that Plaintiff stop the train 50 feet ahead of the additional railcars before coupling them. Before he reached the rail cars, Plaintiff applied the brakes but the train inexplicably failed to stop and slid into the rail cars at a low rate of speed. Immediately thereafter, Plaintiff dismounted the train and noticed grease on the rail. Plaintiff reported the unsafe conditions to the yard master and a supervisor who documented the incident by taking contemporaneous photos of the greasy rails. After the incident, Plaintiff continued his shift until he was abruptly asked to clock out and go home. When Plaintiff attempted to explain the incident to his general manager, he was told he was a "rulebreaker" and that a hearing would take place to assess his fault.

56. Before and after the March 12, 2018 incident, other employees reported grease on the rails, including grease in the same location as the subject incident.

57. Plaintiff received less than 24-hour notice of his hearing and was forced to wait 7 hours for a call back from the union representative he contacted for help.

58. When Union Railroad denied Plaintiff's request for a witness and copies of the photos depicting grease on the rails, Smart TD acquiesced.

59. Before his March 14, 2018 hearing, a Smart TD representative directly advised Plaintiff not to bring up the greasy rails. During the hearing, Plaintiff was accused of violating speed and distance rules and being "dishonest" about his description of the incident. The charging supervisor did not mention the greasy rails or reveal that she had photos confirming the obvious safety hazard.

60. By letter dated March 21, 2018, Plaintiff was informed that the hearing officer found sufficient evidence of guilt on all charges and he was assessed 45 demerits. Plaintiff was further informed he was immediately terminated because he accumulated 138 demerits.

61. Plaintiff appealed his termination to Union Railroad General Superintendent, Joel Hudson, who denied the appeal in its entirety by letter dated April 25, 2018.

62. Plaintiff timely requested an arbitration to assess the validity of his termination.

**Plaintiff's Arbitration Award and "Reinstatement"**

63. More than a year later, on June 21, 2019, the arbitration board found that Union Railroad failed to prove that Plaintiff violated Safety Rule 5.16 and reversed the issuance of 30 demerits for the February 26, 2018 incident. In turn, the board reversed Plaintiff's termination for the March 12, 2018 incident and ordered a lengthy "corrective" suspension as well as the assessment of 27 demerits.

64. The arbitration award specified that Plaintiff should be returned to service with his seniority intact and benefits unimpaired but *receive no back pay for the 15 months he spent out of service*.

65. By letter dated July 31, 2019, Plaintiff was formally terminated from Union Railroad for failure to respond to the Company's request for a "return to work" physical exam.

66. At the time of his March 12, 2018 termination, Plaintiff had been employed by Union Railroad for nearly 11 years and was approaching a significant vesting period for benefits under the Carnegie Pension Fund.

## CLASS ACTION ALLEGATIONS

67. Plaintiff's class claims derive from a single course of conduct by the Defendants. The objective facts are essentially the same for Plaintiff and all other Pension Employees. Within each Claim for Relief, the same legal standards under federal law govern.

68. Accordingly, Plaintiff brings this putative ERISA and NLRA class action pursuant to Federal Rule of Civil Procedure 23.

69. Plaintiff seeks to certify a class under Fed. R. Civ. P. 23 defined as follows to pursue classwide ERISA and NLRA claims: all former employees of Defendant, Union Railroad, who were terminated from Union Railroad, and at the time of their termination were current beneficiaries of the Carnegie Pension Fund or were eligible for benefits under the Carnegie Pension Fund.

70. The prerequisites to maintaining a class action under Fed. R.Civ. P. 23(a) and (b) are met for the following reasons:

A. **Numerosity:** Upon information and belief, there are at least 90 former Union Railroad employees who, at the time of their termination, were beneficiaries of the Carnegie Pension Fund or were eligible for benefits under the Carnegie Pension Fund. Therefore, the proposed ERISA and NLRA Class is so numerous that joinder of all individual members is impractical.

B. **Commonality:** Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to Plaintiff and Class Members are:

   1. Whether the Carnegie Pension Fund is an employee benefit plan within the meaning of ERISA;

   2. Whether Plaintiff and other Pension Employees' terminations were an "adverse employment action" within the meaning of ERISA § 510;

   3. Whether Defendants discriminated against Plaintiff and other Pension Employees with the intention of preventing the vesting of their pension benefits under the Carnegie Pension Fund;

   4. Whether a legitimate, non-discriminatory basis existed for Plaintiff and other Pension Employees' terminations;

   5. Whether Defendant, Smart TD, acted or failed to act in such a way that was arbitrary, discriminatory and/or in bad faith;

      6. Whether Defendant, Smart TD, breached its duty of fair representation under the NLRA; and

      7. Whether Defendant, Smart TD's breach of its duty of fair representation under the NLRA proximately harmed Plaintiff and other Pension Employees.

C. **Typicality:** Plaintiff's claims are typical of the claims of Class Members because they were each terminated from Union Railroad based on their pension status. As such, the claims or defenses of the representative party are typical of the claims or defenses of the class.

D. **Adequacy of Representation:** Plaintiff will fairly and adequately protect the interests of Class Members. Plaintiff has retained counsel competent and experienced in complex class action litigation and with adequate resources to assure the interests of the Class are protected. The named Plaintiff is typically situated and has no conflict of interest with the Class as a whole.

E. **Class Action Maintainable under Rule 23(b)(2):** A class action is appropriate because common questions of law and fact predominate over any individual questions affecting only individual members. Class treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein. A class action will permit a large number of similarly situated persons to prosecute their common claims in a single form simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail.

  No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

F. **Class Action Maintainable Under Rule 23(b)(3):** By engaging in a common pattern and practice of discrimination, the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making a class-wide ERISA and NLRA action the appropriate remedies for the Class.

G. **Ascertainability:**  The Class Members are ascertainable because Defendants can identify every single class member from their regularly maintained employee personnel records and/or pension fund records.  Accordingly, nothing more than a review of Defendants' records maintained in the ordinary course of business will be necessary to ascertain all potential Class Members.

**COUNT I**
**VIOLATIONS OF ERISA § 510**
**(by Plaintiff, Edward Scott, Individually and on Behalf of Similarly Situated Pension Employees v. Defendants, Union Railroad, Transtar, U.S. Steel and Smart TD**

71. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

72. Plaintiff brings this action for violations of ERISA §510 under the civil enforcement provisions of 29 U.S.C. § 1132(a)(1)(b) and § 1132 (a)(3).

73. The Carnegie Pension Fund is an employee benefit plan within the statutory meaning of ERISA, 29 U.S.C. § 1140.

74. Plaintiff and other Pension Employees were participants of or were otherwise eligible to be participants of the Carnegie Pension Fund by virtue of their employment by Defendant, Union Railroad.

75. At all relevant times, Plaintiff and other Pension Employees were qualified for their positions at Union Railroad.

76. Defendants violated ERISA §510 as described herein by taking adverse employment related actions and/or discriminating against Pension Employees with the intent, in whole or in part, of interfering with the attainment of their rights under the Carnegie Pension Fund.

77. As a direct and proximate result of Defendants' violation of ERISA § 510, Plaintiff and other Pension Employees lost significant pension benefits and seek equitable restitution of such benefits.

## COUNT II
### BREACH OF DUTY OF FAIR REPRESENTATION UNDER SECTION 8(b)(1)(A)
(by Plaintiff Edward Scott Individually, and on Behalf of
All Similarly Situated Persons v. Defendant, Smart TD)

78. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

79. Under the Collective Bargaining Agreement, Defendant, Smart TD was the exclusive bargaining representative for Plaintiff and other Pension Employees.

80. Defendant, Smart TD, breached its duty to fairly represent Plaintiff and other Pension Employees by acting or failing to act in such a way that was arbitrary, discriminatory and/or in bad faith.

81. Defendant, Smart TD's conduct seriously undermined the integrity of the arbitral process by preventing Plaintiff and other Pension Employees from rebutting the discriminatory application of Union Railroad's demerits policy and/or "last chance" agreements.

82. Defendant, Smart TD's conduct contributed to the erroneous outcome of the contractual proceedings.

83. Plaintiff and other Pension Employees were proximately harmed by Defendant, Smart TD's breach of its duty of fair representation.

## PRAYER FOR RELIEF

Plaintiff, Edward Scott, individually and on behalf of all others similarly situated persons, respectfully requests that this Court enter judgment against the Defendants as follows:

  A. Declaring the common acts and practices complained of herein to be a violation of ERISA § 510;

  B. Declaring the common acts and practices complained of herein to be a violation of the NLRA duty of fair representation;

  C. An award to Plaintiff and other Pension Employees for all past and future lost earnings and benefits, including but not limited to all Carnegie Pension fund benefits, lost as a result of Defendants' discriminatory conduct;

  D. An award to Plaintiff and other Pension Employees of the costs of this action, together with reasonable attorney's fees;

    E. An award to Plaintiff and other Pension Employees any and all other damages appropriate under ERISA and NLRA; and

    F. Such other relief as may be appropriate under the circumstances.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all issues so triable.

Dated: February 18, 2020

Respectfully submitted,

**ANAPOL WEISS**

 /s/ Sol H. Weiss
Sol H. Weiss, Esquire (ID #15925)
Paola Pearson, Esquire (ID # 318356)
One Logan Square
130 N. 18th St., Suite 1600
Philadelphia, PA 19103
215-735-1130 (P)
215-875-7701 (F)
sweiss@anapolweiss.com
ppearson@anapolweiss.com

**EDGAR SNYDER & ASSOCIATES**

 /s/ Sammy Y. Sugiura
Sammy Y. Sugiura, Esquire (ID #209942)
U.S. Steel Tower, 10th Floor
600 Grant Street
Pittsburgh, PA 15219
412-391-2101 (P)
412-391-7032 (F)
ssugiura@edgarsnyder.com

*Attorneys for Plaintiff, Edward Scott, Individually and on Behalf of All Those Similarly Situated*